Case 16-7134, Republic of Argentina Appellant v. AWG Group Ltd Mr. Slater for the Appellant, Mr. Freeman for the Appellant Mr. Slater, good morning. May it please the Court, Matthew Slater on behalf of the Republic of Argentina, the Appellant. Your Honors, this case concerns an international arbitration award and we're before you asking you to exercise your power under the Federal Arbitration Act to set aside the award and your authority pursuant to the New York Convention to decline enforcement of that award. There are a couple of different issues in the case. I'm going to focus my oral arguments on the issues surrounding evident partiality of an arbitrator. We'll rely on the briefs unless the Court has questions as to the other issues. The binding precedent concerning evident partiality comes to this Court from the Commonwealth Harvey decision. Commonwealth Codings, before you get into the various standards and so forth, can we just work through what seem to be the relevant time spans because it seems to me it's divisible into three. The period from April of 06 to November of 07 when she's unaware of if there's any conflict at all. Your Honor, can I take it back to an earlier time frame? May I take it to an earlier time frame? The arbitration commenced in 2004. Sometime in 2005, the arbitrator was approached by UBS and asked to be considered for appointment to their board. Sometime during that process, they engaged with her about whether she would meet the standards of director independence, but there was no inquiry on her part to determine whether she would meet the standards of arbitrator independence in a proceeding, in a situation where she was already sitting as an arbitrator. So she may not have known of the connection with... But you aren't arguing, are you, that she was actually in a conflict before April 19? Well, I'm arguing that she was in violation of her obligations under commonwealth codings even before April of 2006 when she was formally appointed. Let's assume that argument. That's different from evident partiality. Well, commonwealth codings... It may, under some circumstances, tend to support a finding of evident partiality, but surely alone it's not. Yeah, but it does in this case because it put her on notice that there were a range of entanglements that this financial institution had that she needed to make inquiry about or disclose to the parties that she was not doing so, but she didn't either. And under the... Well, as I understand it, as soon as, more or less contemporaneously with agreeing to the conditions, she got a list of, let's consider one, arbitrations that UBS interests were involved in. Oh, no, Judge Williams, it's the opposite. At some point in connection with her appointment, she was asked by UBS to give UBS, in effect, her CV, which included a list of the parties who were involved in arbitrations in front of her. She did not ask UBS to tell her... In any event, UBS responded, indicating one conflict. UBS asked her to resign from the America's Cut jury, which should have put her on notice that there were a range of entanglements between UBS and the commercial world in which she was sitting as an arbitrator that... I agree that she could have looked at a lot of public sources and seen that UBS was invested... Is there... Can she be guilty of evident partiality, merely because of discussions with the firm about becoming a director, during which efforts are being made, you say it's all from the UBS side, let's assume that, to make sure that there aren't conflicts? For a couple of reasons, I would say yes, Your Honor, and under the Commonwealth Codings Framework. First of all, as you've pointed out, it's evident that UBS's business is to make substantial investments in commercial enterprises, many of which have involvement in commercial international investment treaty arbitration. That fact alone put her on notice that she needed to make inquiry, but there's the other side of it. This has to be mutual. It's not just telling UBS, but it's telling the parties to the arbitration. She's sitting as an arbitrator. This is not something that happened in the past. She's sitting as an arbitrator. It's the telling and the questioning, but what about actual conscious partiality, right? It seems to me, to cut to the chase, that if you work through the three phases that are relevant, either nothing is being decided, or she's unaware, not aware of any conflict. Under this record, during the time period up until November of 2007 when Argentina raised its challenge, she was not aware of UBS's involvement with Vivendi or Suez, but I don't think that that ends the inquiry under Commonwealth, as I said. No. In fact, Commonwealth, in Justice White's view, talks about when they are unaware of the facts, that the inquiry then is whether the relationship is trivial, right? Yes, Your Honor. Isn't that the key inquiry for us, is whether the relationship between the bank and the parties is trivial? The relationship between the arbitrator and UBS is substantial, but the inquiry is, am I not right, whether the relationship between the bank and the parties is trivial? Yes. At the end of his opinion, Justice White says that arbitrators should err on the side of disclosure, even what they might think to be insubstantial relationships. And if they do so, then if later it turns out there is something that they didn't disclose, courts will be able to determine whether those connections are so trivial as to be inconsequential. So triviality is the question here, right? Triviality could be the question if she had made disclosure. But I think we're in a situation where she didn't even make any disclosure. She didn't come to the parties and say... No, I'm quoting. If they are unaware of the facts, but the relationship is trivial. Anyway... I think we have to... The very last sentence. If arbitrators err on the side of disclosure as they should, it will not be difficult for courts to identify those undisclosed relationships, which are too insubstantial to warrant vacating the war. Insubstantial, trivial. So the question for me is, is there a trivial relationship between the bank and the parties? There's $2 billion involved. That doesn't sound trivial. But as a percentage of the portfolio of the bank, it is trivial. And they're passive investors. So how do you deal with that? Well, I'm not sure what it means to be a passive investor in this context. UPS was the largest investor in Vivendi. It was among the largest investors in Suez, so two of the claimants in this arbitration. So that's not trivial vis-a-vis the claimants in this case. UBS was also involved in making these investments on its own behalf, for its own account, as well as in a fiduciary capacity on behalf of its customers for whom it performed wealth management services. So that's not a passive activity. This is not just sitting around investors who happen to have a couple hundred shares of Exxon stock. This is an entity that has, as you pointed out, $2.4 billion. And I think that you just have to assume away the magnitude to say that this is not trivial. This is more than trivial. And that is the issue, as you've pointed out. But there's another issue, though, and that is, under our own precedent, you have to have is a pretty steep hill to climb. Where is any evidence of an improper motive? Your Honor, I... It was resigned before the award was granted? Yes. Your Honor, if I can address that, that comes from Al Harvey. Right. And I think that Al Harvey was... That phrasing in Al Harvey came in a very specific context. And that context that's framed by the court was whether the arbitrator had to make inquiry of a former law firm about whether the former law firm had contacts with parties to the arbitration. And in that context, the court said, you've got to do something more. You've got to come forward with some evidence that points to improper motive in not making disclosure. We're dealing with a different situation. And we're dealing with a situation where the arbitrator is sitting on the arbitration, undertakes a new, very substantial commercial undertaking of her own, where she's being paid hundreds of thousands of dollars and being paid in UBS stock, undertaking fiduciary responsibilities to UBS. And she said, I'm going to tell one side of that equation, UBS, I'm not going to tell the other side, the parties to the arbitration, that this is taking place. So they didn't have the ability to inquire. So that's one indication of improper motive. Second, when this was brought to her attention, she, again, didn't make inquiry. All she asked was, and if you look at 684, the joint appendix, she sent a letter to UBS and said, can you confirm the data that are in the challenge from Argentina? And you get a letter back from UBS that simply says, oh, well, this percentage is off by 2 or 3 percent, or we don't keep records that way. And by the way, we think Argentina's all wet. They weren't even a party to the claim, and they were purporting to make comments on Argentina's challenge. And she adopted that. She didn't say, well, OK, can you tell me more? Explain to me what your relationship is. She just accepted wholesale what UBS told her and did not make inquiry. Third, at that point, she said, I'll step down, but I'll only step down if the interested parties who appointed me, in which UBS has an economic interest, ask me to do so. Not surprisingly, they didn't. She did not consider stepping down from UBS, for example. All of those things, we think, meet the structural elements that are embodied in the Commonwealth Codings decision in which we think Al Harvey is pointing to that get to improper motive. Improper motive can't mean actual subjective bias. If that was the ruling in Al Harvey, it would be directly in conflict with Commonwealth, where it was acknowledged that there was no actual bias. And the court rejected the idea that you had to prove it. And every case since then has rejected the idea that a party has to prove actual subjective bias. Isn't the sense of the competing opinions between Justice Black and Justice White, I mean, Justice Black seems to be favoring the judicial standard, that we, and that any reasonable person, you have to look at a reasonable person to see what they would think of the judge's relationship to it. But that's not the law for us, right? Justice White recognized that when you're dealing with international arbitration, you want experts who are connected to the field and who have, you called them entanglements, who have these relationships. But he was concerned if they were more than trivial, right? So what do we make of the sentence of Justice White? I believe I made clear that the difference, and I think this is correct, that Justice White was rejecting the appearance of bias standard, and instead he set forth very clear standards. That in the case of an arbitrator who has a substantial connection with an entity that in turn has more than trivial business with a party for the arbitration, that's got to be investigated, disclosed. And if the only meaning I can make of those last sentences of Justice White's opinion, that in circumstances where the disclosure is made and a party says, I don't like it, which is what happened here in effect, Argentina said, I don't like it, this stinks. She was obligated to step down and she didn't. And again, this is part of the pattern that we think shows that in the end of the day, the arbitrator chose to align her economic interests and her fiduciary interests with parties, and in particular the claimants who appointed her in the arbitration that's at issue. And that's the circumstance that speaks to Commonwealth Codings and Al-Harbi and justifies making the award in this case. If I can reserve my time for rebuttal. I did want to ask you one question, and that is, do you, the word evident, do you see that as synonymous with apparent, or do you see it as requiring maybe something more than the appearance? Evident partiality? Well, I think that it goes beyond a mere appearance. And again, as an example, and I'm blanking on the case, but one of the cases that cited the case, one of the arbitrators had a couple of hundred shares in Exxon stock that was an indirect participant in the arbitration. They said, Exxon is widely held. A few hundred shares is not a significant amount. That would be an appearance which would preclude a judge from sitting, but it's not evident partiality within the meaning of Commonwealth Codings, which establishes the framework for understanding those words under the statute. In this circumstance, we think we have more than a trivial commercial relationship. If it doesn't mean appearance or apparent, what does it mean? What does evident mean? Well, as I've tried to say, on the facts of this case, I think we have an arbitrator who has chosen to align her economic interests, her fiduciary interests with claimants in the arbitrations before her. And that is sufficient to make it evident that there is a risk of partiality in the case. All right. Thank you. Thank you. Mr. Friedman? May it please the Court. Elliot Friedman for Appellee AWG. And to answer the Court's most recent question, the Second Circuit answered the meaning of evident in Morlatt and in subsequent cases, Scandinavian Reinsurance and others, and they said that evident partiality means that the Court would have to conclude that the arbitrator was partial, would have to conclude. That's a high standard. Now, the District Court found that Argentina's challenge to Professor Kaufman-Coler fell far short. And the District Court was right. This is not a close case. To prevail, Argentina has to show that the connection between Professor Kaufman-Coler and AWG was substantial and more than trivial. That's the language from Commonwealth Coatings. That we have findings from the Arbitration Tribunal which was made on an undisputed record that the shareholdings of UBS in Suez and Vivendi was insubstantial and was trivial in context. The shareholding was so fractional that the outcome of the arbitration, however it was decided, could not have had an effect on the fortunes of UBS. So we have findings of fact that show the exact opposite of what Argentina has to prove here. It shows triviality and a lack of substance. And that, we say, is the simple way to resolve this case. Now, both sides agree that the cornerstone of the inquiry is materiality. Now, consider the facts. Professor Kaufman-Coler had no interest in any of the parties that were before her. She had no interest in AWG. She had no interest in Suez. She had no interest in Vivendi. Her interest was entirely derivative. So then you look to UBS. And UBS's shareholding in these parties was not 1% of its invested assets. It was not half a percent. It was one twentieth of the parties. But what percent was it of the parties? It was around, I believe, 2 and 3%. But the inquiry has to be from the perspective of the person, the entity, that is subject to the evident partiality inquiry. Because you're asking, is there a possibility of bias here? So you ask it from the perspective of the entity that holds the shares. And the entity that holds the shares is holding one twentieth of 1%, the majority of which is held on behalf of its customers, not for its own benefit. So the shareholding is trivial in the most perfect sense. It couldn't be more trivial than one twentieth of 1%. There's no dispute that Professor Kaufman-Coler did not know of these shareholdings before the challenge arose. There's no dispute. When the challenge arose, she asked UBS to run a conflicts check. The conflicts check came back clear. She made reasonable inquiry. The only test that is required, even under the Ninth Circuit Maulidian standard, this is in the Schmitz case, the only requirement on Professor Kaufman-Coler was to make reasonable inquiry. And she made reasonable inquiry. She asked UBS, do I have a conflict? The conflict check came back no, which stands to reason, because the shareholding was so remote. And the final important fact to remember is, it's a question of timing. Judge Williams started with this. It's a question of timing. You have two decisions that are challenged before you today, the decision on liability and the final award. The decision on liability was rendered one year after Professor Kaufman-Coler resigned from UBS. The final award was rendered six years after Professor Kaufman-Coler resigned. Well, if there had been, and I think it would be more difficult, if there had been material processes of the tribunal during the period in which she was aware of the conflict, because those, presumably, if such processes had occurred, they would have potentially cast a shadow on the outcome. That would be a harder case, but that's not our case. And so the suggestion that she should have done more, it's difficult to understand what could have been this greater action than saying to UBS, tell me if I have a conflict with any of the parties to the arbitrations in front of me. And they say no. So it's difficult to understand what else she could have done, what the conduct is exactly that Argentina is complaining about. Do we know how Argentina found out about the UBS holdings? I don't think that's in the record, no, but the challenge was raised. Because it did raise the challenge for the tribunal. It eventually found out, but that was, I think, 19 months after Professor Kaufman-Coler. And by the way, also, just a few weeks after, Argentina's first challenge to Professor Kaufman-Coler failed. Now, this is not an extreme situation. Argentina challenges arbitrators, as a matter of course, in the arbitrations against it. So this is not an extreme situation. This is the standard playbook of Argentina. They challenged her once, but deciding a case against them, that failed. They challenged her again, that failed. And they challenged her in a variety of other cases. And every other body to have considered this challenge, and there have been five of them, have determined that there is nothing to this challenge. The decisions are in the record. It's the decision of this tribunal, the decision of the lower court, the decision of the EDF tribunals, and the NOMA committees. Each of those decisions was well-reasoned and comprehensive, and each of those decisions had no difficulty in finding that this was a trivial challenge, that there was no possibility for a conflict of idea. Can I ask you about the district court gave alternative standards of review, but isn't the de novo review what she was bound to use, rather than the deferential standard of review? I don't think so, Your Honor. Okay, why? There is no situation, I think the Supreme Court has been clear on this for 20 years, there's no situation in which arbitral decision-making, the facts found by an arbitration tribunal, receive de novo review in a court. There's no situation, under no limb of section 10 of the FAA, do you receive de novo review. There are two situations in which de novo review is possible. This was in first options. One, where you say, I never signed this agreement, there is no arbitration clause that is binding. That's understandable that you'll receive de novo review. And the second is, I agree to arbitrate my contract claim, but you decided my family law claim. That's another instance where there might be de novo review. But if there is a decision that is within the competence, within the jurisdiction of a tribunal, and here this is because the parties agreed that the tribunal would resolve this challenge. So if there is a decision on a matter within arbitral decision-making, that always receives deferential review. And why? Because we don't want to turn arbitration into the first step of a long wave of litigation. The object of arbitration is an alternative to litigation. Now Argentina says, you cannot fulfill your statutory mandate under section 10A2 without de novo review. But you fulfill all of your statutory mandates under all of the subsections of section 10 by applying deference. Yes, you are undertaking the evident partiality inquiry. But no, you're not doing it on a blank slate. You have findings of fact from the tribunal. You have a decision by arbitrators who are vested with the power to make the decision. And then it comes up to the courts. And the courts exercise deferential review in this respect as in every other respect. Now, most of the evident partiality challenges that will come before you will not have a decision already made by the tribunal. So the issue of deference will be moot because there will be nothing to which you should defer. But here, which is a relatively unique situation, where the parties have given the tribunal the power to resolve this question, then you have deferential review. Is the finding that the UBS holdings of the arbitration could not have an effect on the value of UBS stock, is that a factual finding in the normal sense of the word? I believe it is, Your Honour. This was a matter that was put before the tribunal. We made the allegation... It's a matter of prediction. Of course, one does make predictions about matters of fact. There's no doubt about that. But it's not, or is it? Maybe it is a separable, dichotomous answer. Yes or no? Or just a little bit? Just a little bit is not a possible answer? It might be. But we had this debate before the tribunal. And you'll see in the tribunal's decision that Argentina had ample opportunity to address this very question. We argued that it would have no effect. One twentieth of one percent, that will have no effect. Argentina had the opportunity to respond on that. They could have introduced factual evidence. They could have introduced an expert, an economic expert, to say, this will have an impact, look at my mould. They did none of that. And that's why this finding was based on an undisputed factual record. And it's why also this is not the proper inquiry of a district court or an appeals court. Because we're talking about findings of fact to which you must give deference under Supreme Court precedent. There are no further questions? I have one, and that is out of the record. And that is, what's the status of the water supply and so forth in Buenos Aires? I mean, that seems to be a pretty important project. The findings of fact in the arbitration tribunal's decision show that our clients improved it enormously. The supply of water to Buenos Aires, the water treatment services, and I believe that things are going well. Okay, great. Thank you. How much time does Mr. Slater have? Okay. Thank you, Your Honor. Just, Judge Williams, if I can return to your question. There were material processes that took place during the time that Professor Kauffman Kohler was aware of the connection between UBS and AWG. In particular, the submissions and the tribunal's deliberations on the question of liability. And the decision on liability ultimately had a huge impact on... So when is the deliberation, the tribunal deliberating liability? Well, the decision on jurisdiction was in August of 2006. So they were deliberating jurisdiction during the time that she was embarking on her undertaking with UBS. Yeah, but that's before she's aware. Yes, and then she becomes aware in November of 2007. Right. The decision on liability is not issued until 2010. So throughout the period 2007, until her resignation or her decision not to stand for re-election to UBS in 2009, they were receiving the party's briefs and... What does receiving mean? I mean, the parties were making... I have to admit that they're not necessarily our first reading material on the moment of arrival. That's one of the critical differences between arbitrators and judges. They're paid to spend all of their time reading voluminous briefs, and so they do spend time quite quickly. I don't have in front of me the date of the hearing on liability, but I believe it fell during that time period. What are we paid to do? I'm sorry? You're paid to make decisions. Whoever comes before you, whatever their means are, it's a very different arrangement, and we appreciate it very much. Another thing I want to correct is there was no request by Professor Kaufman Kohler to do a conflict check. Just to go back. Yes. Where in the record will we find indication of tribunal activities in the period from November 2907 to April 1509? The decision on liability itself sets out the procedural history of the consideration of liability. It will have all of the determinations, excuse me, all the dates of submissions as well as when the tribunal sat. That begins at page 199 of the joint appendix. The hearing on the merits took place in the October-November 2007 time frame. That's on page 211 of the joint appendix. Then the deliberations continued from that time until the rendering of the award on the 30th of July of 2010. I was starting to say that the decision on liability had a profound impact on the damages as well because there was a disagreement on the date of violation of the treaty. Under the minority view, the violation took place considerably later, and that would in effect have wiped out the damages in this case. As I said, Professor Kaufman Kohler did not make a request for a conflict check. She responded to a request by UBS for her to tell them about her involvements so that they could make a decision about director independence. She did not ask that they inform her about their relationship to the parties. AWG here, as well as in their briefs, transposed the Commonwealth Coding Standard. The question is not whether Professor Kaufman Kohler had a substantial relationship with AWG or with the other parties in the arbitration. The question is, is there a substantial relationship between the arbitrator and an entity which itself has business with a party to the arbitration that is more than trivial? I think triviality in this context needs to be looked at from both sides and certainly from the perspective of Suez and Vivendi. You can be sure that they knew that UBS was the largest shareholder in the case of Vivendi and among the largest in the case of Suez. There was a suggestion that the record of the arbitration... You're beyond your time, so can you wind it up? Yes, Your Honor. I would say that international investment treaty arbitration is under a lot of stress and criticism these days because of the fact that arbitrators are largely drawn from the corporate world. And if you affirm in this case, you will be saying not only is that okay, which it is, but that an arbitrator can assume the mantle of responsibility to a substantial commercial enterprise that in turn has more than trivial business with parties to the arbitration, not disclose that fact, when called on it not be required to step down. And we think that would send the wrong signal. We think that that constitutes evident partiality within the meaning of common law. Thank you.
judges: Henderson, Griffith, Williams